Cynthia Kitchens v. The Boeing Company
Case No. 2:16-cv-03723-RMG-MGB
DEFENDANT THE BOEING COMPANY'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING
MEMORANDUM

# EXHIBIT "A"

## EXCERPTS FROM THE DEPOSITION OF CYNTHIA KITCHENS

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH CAROLINA
 2                 CHARLESTON DIVISION

 3    CYNTHIA KITCHENS,

 4             Plaintiff,

 5         vs.        CASE NO. 2:16-CV-03723-RMG-MGB

 6    THE BOEING COMPANY,

 7             Defendant.

 8


 9    DEPOSITION OF:   CYNTHIA KITCHENS

10    DATE:            FEBRUARY 23, 2017

11    TIME:            10:15 AM

12    LOCATION:        NEXSEN PRUET, LLC
                       205 King Street, Suite 400
13                     Charleston, SC

14    TAKEN BY:        Counsel for the Defendant

15    REPORTED BY:     Laura J. Bash,
                       Registered Merit Reporter
16    _____

17        A. WILLIAM ROBERTS, JR., & ASSOCIATES

18           Fast, Accurate & Friendly

19

20    Charleston, SC   Hilton Head, SC Myrtle Beach, SC
      (843) 722-8414   (843) 785-3263   (843) 839-3376
21
       Columbia, SC    Greenville, SC    Charlotte, NC
22    (803) 731-5224   (864) 234-7030   (704) 573-3919

23

24

25
```

AWR

Kitchens, Cynthia v                                            Cynthia Kitchens
Boeing Company                                               February 23, 2017

30

1          And we were at our desks, I was sitting

2     here, he was sitting next to me, talking to me; we

3     walked down and you go to the end, and there is

4     Gordon's desk.  So about a week or so later, I

5     walked by Gordon's desk and he was talking to

6     Gordon, Mike was.  And he said, Cindy, walk with me

7     a minute.  And I said, okay.  So we walked back up

8     towards my desk; and he said, did you ever have

9     chemo?  And I said, well, yeah, you know, I had

10    chemo in my treatment.  He said, do you know what

11    chemo fog is?  And I said, yeah, but it's not like

12    Alzheimer's, it doesn't stay with you.  And he

13    said, well, you think it's that or your age?  And I

14    said, I don't know.

15          And so we walked on up to the stairs

16    back towards my desk.  We were at top level there

17    by my desk, and I -- I said, if that's what they

18    truly think, then I'm screwed.  And the reason I

19    asked him was because I said, I'm being blackballed

20    for something.  If it's something in my job that I

21    can improve, I will be glad to improve it.

22          But when he told me what -- I don't

23    know if he went to the seniors.  I don't know if it

24    was his opinion.  Alls I know is that's what he

25    told me.  And I thought at that point, I can't fix

Kitchens, Cynthia v
Boeing Company

Cynthia Kitchens
February 23, 2017

31

```
 1   that.   If that's their true belief, I can't fix
 2   that.
 3        Q.   Did this conversation that you've just
 4   described with Mike Tidmore, do you remember what
 5   year that occurred?
 6        A.   It was -- I think it was like in
 7   April 2015.  Because he was covering for one of my
 8   senior managers at the time.  I'd had Mike before
 9   as a senior manager, and I knew he was a good
10   manager.  And -- and I knew he would be honest with
11   me if I asked him to find out what was going on.
12        Q.   And did you report what Mike told you
13   to anyone at Boeing's EEO department?
14        A.   No.  I don't think I did for that.  I
15   went to the other managers, because you're allowed
16   to do that when you have -- you know, amongst your
17   peers to -- I said, you know, what can I do to fix
18   this?
19        Q.   Okay.
20        A.   You know, I felt like I had talked to
21   Gordon about it.  I talked to Dallas Ratliff.  I
22   talked to Bill Hobek.  And I actual talked to my
23   leadership coach about it, my executive leadership
24   coach that I had, Jennifer -- I can't think of her
25   last name, S-K-P --
```

32

```
 1              THE WITNESS:  Do you remember her last
 2   name, Bonnie?
 3   BY MS. CHERRY:
 4        Q.    Ms. Kitchens, you're not permitted to
 5   talk to your attorney while you're under oath about
 6   your lawsuit.  Okay?
 7        A.    Oh, okay.
 8        Q.    And that includes not just when we're
 9   here in the room, but when we take a break.
10   Because you are under oath, you cannot discuss your
11   testimony.  And if you don't remember something,
12   it's okay for you to tell me you don't remember.
13   She can't help you with your testimony.  Okay?
14        A.    Okay.  But I have it in an e-mail that
15   I gave to her, so I can get it to you if you need
16   it.
17        Q.    Okay.
18        A.    Okay.
19        Q.    And so tell me, as I understand it,
20   your conversation with Mr. Tidmore was asking why
21   you were still in Cell 10; is that correct?
22        A.    Why I was put back in there, yes.
23   Because before I went out for my cancer treatment,
24   I was asked to be the process monitor manager over
25   the whole site and I had like four or five
```

```
 1    employees in each building.  And then when I came
 2    back was when I found the mistake that I told you
 3    about, the large mistake.
 4                And then I was put on day shift.  Keith
 5    Castleberry asked me to go on day shift for a
 6    little while, but never said why I was going on day
 7    shift.  And I was on there like three weeks, and
 8    then they asked if I would go back on second shift.
 9    And I went back on second, and that's when Mike was
10    like the manager.
11                And that was -- well, that was after I
12    had come back.  I'd been back a while before that
13    happened.  Because I went out with cancer in 2013.
14         Q.    Okay.  And I'm just trying to
15    understand, Ms. Kitchens, and I'm not quite
16    following.  You were asked to be on second shift
17    and --
18         A.    And then I went on -- I'd go -- I
19    always went on any shift they asked me to.
20         Q.    Okay.
21         A.    So I went on second shift, back in
22    Cell 10.  And then that's where I stayed, and it
23    was like I couldn't get off -- out of that cell.
24    And you know, I tried to get different jobs.  I
25    tried to apply for flight line because my -- you
```

34

1    know, my credentials and things are more for flight

2    line and the 145.  Which is once an aircraft is

3    certificated, it's under 145 repair station.

4         Q.    Okay.  So and that's what I'm trying to

5    understand when you talk about getting out of

6    Cell 10.  It's other positions --

7         A.    Right.

8         Q.    -- that you applied for?

9         A.    Correct.

10        Q.    And so it's your testimony -- this is

11   what I'm trying to understand -- that Mr. Tidmore

12   told you you were not getting the other positions

13   that you applied for either because of chemo fog or

14   age; is that correct?

15        A.    Yes.  And I had asked him, could you

16   please check and see why I'm stuck in Cell 10?

17        Q.    Okay.

18        A.    Because if it's a problem of something

19   I need to improve, I was willing to go get the

20   schooling or whatever they needed for me to -- to

21   move on into another position.  I have all kinds of

22   certificates and licenses and stuff.

23        Q.    Sure.

24        A.    I didn't know what more they needed.

25   So I found out we had that leadership coach, and I

```
 1    I forgot my one grandchild's name.  Because I knew

 2    this picture, but I didn't know who he was.  So

 3    there is such a thing as chemo fog.

 4         Q.   Sure.

 5         A.   And then when I said, well, I don't

 6    know, I did forget my -- my grandchild's name.  But

 7    then he -- he just said, well, you think it's that

 8    or your age?  So, you know, that's exactly what he

 9    said to me.  So I felt that he must have went and

10    asked.  I mean, I just assumed he went and asked

11    and didn't just take that on himself, but I

12    wouldn't know.

13              I mean, if he's under oath and he has

14    to sit up there, he can tell you the same thing.

15         Q.   And so you -- you don't know who

16    Mr. Tidmore spoke to --

17         A.   Spoke to?

18         Q.   -- or even if he did?

19         A.   No, I don't know that.

20         Q.   Okay.  And was Mr. Tidmore the hiring

21    decision maker for any positions that you had

22    applied for?

23         A.   He was my senior manager at that time,

24    so that's who you go to to ask those questions.

25         Q.   Sure.
```



Kitchens, Cynthia v                                          Cynthia Kitchens
Boeing Company                                               February 23, 2017

40

```
 1                And, Ms. Kitchens, that's not what I
 2     asked.
 3            A.    Okay.
 4            Q.    Was he the hiring manager for any of
 5     these positions that --
 6            A.    No.
 7            Q.    -- you applied for?
 8            A.    You don't know who the hiring manager
 9     is when you apply for them, so I wouldn't know at
10     that time if he was the hiring manager for any of
11     them.
12            Q.    Okay.  I tell you what, Ms. Kitchens,
13     I'm going to come back and ask you about -- a
14     little more about this conversation.
15            A.    Uh-huh.
16            Q.    But I -- I want to cover a few other
17     things, then we'll come back to that.
18            A.    Okay.
19            Q.    How long have you -- as I understand
20     it, you live in Florida currently?
21            A.    Uh-huh.
22            Q.    Okay.  How long have you lived in
23     Florida?
24            A.    I moved down there October 14th.
25            Q.    Okay.  And prior to October 14th of
```

2:16-cv-03723-BHH    Date Filed 11/16/17    Entry Number 31-1    Page 10 of 49

```
 1   the time.
 2        Q.    Okay.  And do you -- and I'm going to
 3   ask you a little more.  I understand that you
 4   resigned your employment --
 5        A.    That's correct.
 6        Q.    -- but, Ms. Kitchens, did your
 7   resignation of employment have anything to do with
 8   having made some reports in 2011?
 9        A.    No.  That was back in 2011.  I worked
10   there all the way up until this last year.
11        Q.    Okay.
12        A.    The harassment and retaliation and
13   intimidation factors of that company were just
14   unbearable, and I just couldn't do it anymore.
15        Q.    We were talking about, Ms. Kitchens,
16   your use of different policies or procedures at
17   Boeing in terms of making complaints, that you've
18   used Boeing's ethics, used it in 2011.  You used it
19   again in 2014.
20        A.    Uh-huh.
21        Q.    And I understand that you're aware of
22   Boeing's code of conduct policy and requirements.
23        A.    Uh-huh.
24        Q.    And I wanted to hand you what I'm going
25   to mark as Exhibit 17, an instance where I believe
```

Kitchens, Cynthia v
Boeing Company

Cynthia Kitchens
February 23, 2017

148

```
 1              So that year, Steve Parrinello got the

 2     highest score that he'd ever got because he got my

 3     scores.  So -- and then the next one they did, they

 4     changed managers, which I changed with Gordon and

 5     Gordon got a high score because he got my scores.

 6     Because he -- he came over and thanked me.  Thank

 7     you, Cynthia, I got really high scores because I

 8     got your scores.

 9              (DFT. EXH. 32, 7/15/2014, Boeing

10     Performance Management document, 4/1/2014 -

11     12/31/14, was marked for identification.)

12     BY MS. CHERRY:

13        Q.    I'm going to hand you what I have

14     marked as Exhibit 32, Ms. Kitchens.  And this is

15     the PM for 2014, the interim PM for 2014.  So this

16     was the first PM after the 2013 final year-end PM.

17     Okay?

18        A.    Okay.

19        Q.    Flip to the last page.  And if you

20     look, so Stephen Parrinello is the one who signs

21     this in July, correct?

22        A.    Correct, uh-huh.

23        Q.    Okay.  And it looks like he -- his

24     leadership attribute score for you was a 16.  Did

25     you disagree with that score?
```

Kitchens, Cynthia v                                    Cynthia Kitchens
Boeing Company                                        February 23, 2017

149

1          A.    On one of them for one of the things
2    for a find a way or for -- the one he gave me a 2
3    on, he said, you don't reward your employees.  And
4    I said, well, yes, I do.  Because you get a bag of
5    tokens and all these certificates, like 25 of them.
6    And I gave them out every month.  I didn't give
7    them just to my people.  I gave them to the trash
8    guys, the ladies who cleaned the restroom, anybody
9    that was working hard, mechanics, I gave out
10   everything.
11          And he said, oh, well, you didn't
12   record it.  And I'm like, where are you supposed to
13   record it at?  Well, they put something online that
14   you were supposed to go in and write everybody's
15   name you gave it to and why you gave it to them.
16   And I said, if I'm giving out certificates just to
17   get a better PM for myself, then I'm not giving the
18   certificates for what they are meant for.  They are
19   meant for doing a good job or for improvement.
20          So I said, I'm not -- you know, I said,
21   let's go over to the department where they turn
22   them in and you can count my name on all the
23   certificates and see that I have done it.  And he
24   goes, oh, no, don't worry about it, we'll do it
25   next time.  So I just stayed with the 2, because I

150

1   was like -- and a couple times, I thought, I need

2   to go over there and just get how many they have so

3   that I could raise that up from a 2.

4            But I thought, I've got -- I've got

5   work to do.  And that's why I always said when it

6   came to my PM, I would just let it go to make sure

7   I maintained the work on the floor in the aircraft.

8   But I was surprised he gave me a 16 on that one.

9        Q.    And why were you surprised with a 16?

10       A.    Because he wanted to do like a 1 or --

11  in a couple areas, and I talked him up to the 3s

12  and the 2s.  So, you know --

13       Q.    So the score was better than you

14  thought he was going to give you?

15       A.    Yeah.  I actually had brung

16  documentation that time with me.  I brought a

17  folder and said, okay, Steve -- and I actually

18  presented -- he had put me in a 1 or a 2 for one of

19  these.  And I said, Steve, really, how can that be

20  when I scored 100 percent?  And he looked at me --

21  because then I had the documentation.  He goes, oh,

22  okay, and he changed it.  So it was good to start

23  keeping this kind of stuff because, then, at least

24  I had something to take to my PM to bring it up to

25  my score.

Kitchens, Cynthia v                                          Cynthia Kitchens
Boeing Company                                              February 23, 2017

151

1          Q.    Okay.

2          A.    And that's -- actually, these documents

3    are actually what I used also with ADR to bring up

4    the scores that they had given me.  Because there

5    was like three or four where he contradicted

6    himself, and it was shown I had scored 100.  So he

7    had to change it.

8          Q.    Okay.  So having the documentation

9    actually resulted in --

10         A.    Brought my -- brought my score back up.

11         Q.    Yes.  Okay.

12         I'm going to hand what you what we'll

13   mark as Exhibit 33, Ms. Kitchens.

14         (DFT. EXH. 33, 12/23/2014, Boeing

15   Performance Management document, 4/1/2014 -

16   12/31/2014, was marked for identification.)

17   BY MS. CHERRY:

18         Q.    If you look, this is your year-end PM

19   for 2014.  It looks like Mr. Parrinello has signed

20   this again.

21         A.    This is right before the Christmas

22   holiday.

23         Q.    Okay.  And what's your leadership

24   attribute score then?

25         A.    It was 15.

```
 1    ethics and told them somebody needs to get down
 2    there and figure out what's going on.
 3            Q.    And I'm going to ask you about that in
 4    a minute.
 5            A.    Uh-huh.
 6            Q.    But let me ask you about your next PM.
 7            A.    Okay.
 8                 (DFT. EXH. 36, Boeing Performance
 9    Management document, 1/1/2015 - 12/31/2015, was
10    marked for identification.)
11    BY MS. CHERRY:
12            Q.    I'm going to hand you what I have
13    marked as Exhibit 36.  And this is your interim PM
14    from 2015.  So this, if you turn to the last page,
15    it's dated June 30th of 2015 and signed by
16    Mr. Parrinello.  Do you see that?
17            A.    Yes.
18            Q.    So this PM would have come after your
19    communication with Ms. Wyse in April of 2015,
20    correct?
21            A.    Correct.
22            Q.    And if you look --
23            A.    And then I have a question.
24            Q.    Sure.
25            A.    Where is the one that he raised back up
```

```
 1   to a 17?  Because I haven't seen that.
 2        Q.    That -- we went over the ADR form for
 3   the raising of your score on that one.
 4        A.    Oh, it didn't show it on the paper?
 5   Because it said --
 6        Q.    I just didn't print that one.
 7        A.    Okay.
 8        Q.    So the -- this one is after your
 9   meeting with Ms. Wyse.
10        A.    Okay.
11        Q.    If you look at your leadership
12   attribute score, it's a 16, correct?
13        A.    Correct.
14        Q.    Okay.  And Mr. Parrinello gave this to
15   you in June of 2015, right?
16        A.    Correct.
17        Q.    And if you look in your employee
18   comment section, there's a statement that says:
19   Need to start sending e-mails to record things that
20   I do.  And then:  Because of lack of my written
21   communication, I received two at lower than I would
22   have if I had sent e-mail to let seniors know.
23             Do you see that?
24        A.    Uh-huh.
25        Q.    Is that what you were telling me about
```

186

1           (DFT. EXH. 39, 12/1/205, E-mail chain,

2     was marked for identification.)

3     BY MS. CHERRY:

4           Q.    Okay.  I'm going to hand you,

5     Ms. Kitchens, an e-mail chain that you produced

6     with LePrincess Porter.

7           A.    Uh-huh.

8           Q.    Who is Ms. Porter?

9           A.    HR.

10          Q.    Boeing's HR?

11          A.    HR for the 20 Building for quality.

12          Q.    Okay.  So she was your point of contact

13    for HR?

14          A.    Yes.

15          Q.    Okay.  And tell me what -- the subject

16    lines, it has to do with trash left on desks.  Tell

17    me what's going on here.

18          A.    Okay.  So I had a temp manager who

19    was -- she was put into a temp manager's position,

20    and she started -- I don't know why -- well, I take

21    it back.  We had an audit.  And I was auditing the

22    tool cage which had my name on it.

23          Q.    Okay.

24          A.    And she said, there's nothing wrong

25    with the cage, it was totally fine.  Well, I

Kitchens, Cynthia v                                    Cynthia Kitchens
Boeing Company                                         February 23, 2017

187

1    audited the tool cage and I had three pages of what

2    wasn't fine with it.  It had tools in there from

3    the other building.  That was part of our PC700, so

4    it's a big deal.

5            And the big deal is it had my name on

6    it, not hers.  So she felt like I was attacking her

7    because she had sent the e-mails to the seniors.

8    You know, she's a temp manager.  So she wanted to

9    try to do a good job, and I get that.  But she

10   thought that that was an attack against her.

11           And then, you know, we'd send stuff,

12   like she would let jobs go on down line instead of

13   completing them.  And we did a turnover in our --

14   turnover, and we'd send her the document of where.

15   You know, she let it go on down line, which means

16   they have to remove a lot of stuff to get to that

17   point to fix it.  So it caused a lot more work and

18   everything.

19           So then she started coming to my desk

20   and attacking me.  She brought this woman to the

21   desk that was in safety and said, we can get on the

22   ladder, I don't know why you can't get on the

23   ladder.  And she sent me an e-mail -- I work third

24   shift, so I don't come in till 11:00.  She sent it

25   when she went home, after first shift, and said,

Kitchens, Cynthia v                                    Cynthia Kitchens
Boeing Company                                        February 23, 2017

188

1    we're having a meeting in the morning.  Well, a

2    meeting in the morning, I already had a manager's

3    meeting that was mandatory.  I couldn't meet it.

4              But I can't answer her because I'm on

5    third shift, and she's coming in at 6:00, thinking

6    I'm going to be there for the meeting.  So when I

7    wrote an e-mail that I wouldn't be at the meeting

8    because I had this other meeting, so she comes to

9    my desk and she starts screaming at me in front of

10   everybody.  You're not a team player, you're not a

11   team player.  You know, you need to do this.

12             And I'm like, I'm -- I'm late for this

13   other meeting, I have to go.  I said, I took care

14   of it in my meeting with my employees last night.

15   We made sure, you know, everybody could get to it.

16   Everybody is getting training for the machine to

17   get up there so they don't have to use the ladder.

18   She goes and takes a picture of herself on the

19   ladder so that she could show she could see on top

20   of the plane with the ladder.

21             It was just nonsense, things like that

22   all the way up.  So I cleaned the department every

23   night when I'm there.  So I went over, and there

24   was a bag of trash they found on a plane.  FOD,

25   they call it.  And they use it at the boardwalk in

1    the morning.

2              So I put it on her desk so she could

3    take it to the boardwalk in the morning.  And then

4    there was a soda bottle.  They had a party.  So I

5    put that on her desk.  So she takes a picture in

6    the morning and sent it to my manager that's --

7    she's putting trash all over my desk.  And, you

8    know, my manager sends back, that's totally

9    unacceptable, Cindy -- without even asking me why

10   did I put it there.

11             I'm not going to throw your soda away

12   because I don't want you to be upset.  And you need

13   the FOD, so I'm not going to throw that way.  I

14   don't know what the big deal was.

15             So I knew at that point -- and -- and I

16   had already spoke to Steve about it in our meeting.

17   And I sat down -- I came in early one night at

18   5:00, I didn't work till 11:00 and I said, look,

19   Steve, I said, she's harassing the crap out of me.

20   You need -- he goes, do you want me to talk to her?

21   I said, I just want her to like stay away from me

22   or, you know, I'm going to have to move to another

23   area.

24             Because I have issues with -- because

25   of my cancer, that when I'm under stress, I just go

190

1    to the bathroom.  I can't get up and leave.  It's

2    just happening.

3            Q.    So Ms. Tracy Darnell, was she --

4            A.    Yes.

5            Q.    Was she --

6            A.    It was Tracy Cleveland.

7            Q.    I mean, Tracy Cleveland.

8            A.    No.  It's Darnell now.  It was Tracy

9    Cleveland.  She got married.

10           Q.    So Tracy Cleveland was a female manager

11   on a different shift?

12           A.    She was on first shift.

13           Q.    On first shift?

14           A.    Yeah.

15           Q.    And so when you say "she," I just want

16   to make sure that the record is clear --

17           A.    For the name, yes.

18           Q.    -- that's it's Tracy Cleveland.

19           A.    Right.

20           Q.    So it's a -- she's the same level

21   manager as you?

22           A.    She was a temp manager.

23           Q.    Okay.  But I realize temp, but same

24   level?

25           A.    Yes.

Kitchens, Cynthia v
Boeing Company

Cynthia Kitchens
February 23, 2017

191

```
 1          Q.    Okay.  So same level manager as you --
 2          A.    Right.
 3          Q.    -- but temporary, on a different shift?
 4          A.    Right.
 5          Q.    And there was tension for the reasons
 6    that you've explained to me, some of the issues
 7    going on?
 8          A.    Correct.
 9          Q.    And that became stressful for you?
10          A.    Yes.
11          Q.    Okay.  And I understand this e-mail, it
12    looks like, that you sent to LePrincess, who was
13    the HRG for you -- or for your area.
14          A.    Right.
15          Q.    And you're asking her to -- you say:  I
16    need this to be recorded.
17          A.    Well, and I -- I said to Steve, you
18    know, I'm serious, you need to move me out of this
19    situation because -- I mean, it was starting to
20    really cause issues with -- you know, with my
21    cancer treatment.  And I was in recovery -- I'm
22    still in recovery, because it's five years after
23    you have cancer it can come back in that five-year
24    span and you have to continue to doctor and stuff.
25                So stress is like the number one thing.
```

192

1    So I told him, please, just move me.  I didn't say

2    move her.  I said, move me, just put me somewhere

3    else and, you know, we'll talk about it.  And then

4    I sent it to HR to let her know that, you know, it

5    needed -- it was serious and it needed to be taken

6    care of or I was going to have to -- you know, I'm

7    going to have to go somewhere else.

8              And that's when I said to EEO -- I

9    meant EEOC.  I see it's not written out right.

10         Q.    Okay.

11         A.    But you know, and then Steve came back

12   to me and said, no, we're not going to do that.

13   And that's when the trash issue came out.  And I

14   said, look, I need to have a meeting.  And he sent

15   a thing and said, we'll have a meeting and then

16   we'll -- we'll fix it or something.

17             And I said, I've already asked for a

18   meeting.  Let's have a meeting with HR and her

19   and -- and go over it, and her manager.  So they

20   called the meeting.  And I said, let's sign my PM.

21   And he was like, no, no, let's wait.  Because my PM

22   was ready the week before, and he wouldn't let me

23   sign it.

24             So we went to HR.  It was Tracy,

25   LePrincess, myself, Steve, and Sue.  Because Sue

Kitchens, Cynthia v                                    Cynthia Kitchens
Boeing Company                                        February 23, 2017

193

1    was -- what was her name?  Heitkamp is -- was her

2    manager at the time.  And so, you know, we

3    discussed a few things in there.  We didn't discuss

4    everything that had led up to that.

5              So they said, okay, we're going to give

6    you each a verbal corrective action.  And I'm

7    sitting there stunned because I'm a manager and

8    she's a temp.  HR should have took her manager and

9    her in another room, because that's the process,

10   and gave them what was going to happen.  And I

11   should have received mine.  And I'm thinking, okay,

12   okay, we're both in here, I'm going to let this go.

13             So then I come in, and there's an

14   e-mail that's sent out in an e-mail form that

15   Cynthia Kitchens received a verbal corrective

16   action and Tracy -- and I'm thinking, what is this?

17   So I went back to LePrincess and said, this is not

18   like per your process, this isn't even supposed to

19   happen.  And she said, well, no, you're wrong.  She

20   goes, she was just recording the minutes.  And I go

21   who records minutes of a write-up meeting, you

22   know?  It was just like insane.

23             So that -- as soon as we left that

24   meeting, they actually moved her to the other end

25   of the building.  Because at that point, they knew

Kitchens, Cynthia v                                    Cynthia Kitchens
Boeing Company                                          February 23, 2017

194

1   that, you know, I said I'm going to report this if

2   you don't do something.  So they moved her to the

3   other end of the building, and she worked down

4   there.  So I didn't have to like have her in the

5   same department and deal with it and stuff.

6              And the thing was, she was a temp

7   manager.  I was helping her in the beginning,

8   mentor her and everything.  And then all of a

9   sudden, she just went -- when -- with the tool

10  cage, she just -- I don't know what happened to

11  her.

12             And actually, I'm the one that got her

13  and Chereld Thorne their temp managers' positions.

14  Because when Miranda Wright came -- or Miranda

15  Jennings came in as a senior, I said, would you

16  please look at these two ladies, they've been

17  overlooked, they're both black women, they've been

18  overlooked through their career.  These other guys

19  are -- been in their class and they're senior

20  managers.

21             And so she made them both temp managers

22  to give them the chance to see what they could do.

23  So...

24       Q.    So do you remember when Ms. Cleveland

25  was moved?  You said she was moved?

1    A.    The day -- the day I had the meeting

2  with HR, that morning, they moved her to the other

3  end of the building.  And that was the -- they

4  would have had it recorded for me as getting the

5  verbal corrective.

6    Q.    Okay.  And as I understand it, you both

7  did?

8    A.    Yes.

9         (DFT. EXH. 40, E-mail chain, was marked

10  for identification.)

11  BY MS. CHERRY:

12    Q.    Okay.  And I'm going to hand you

13  Exhibit 40, Ms. Kitchens, and just ask -- this is a

14  group of e-mails between you and Steve Parrinello

15  and LePrincess Porter regarding --

16    A.    This was about the trash thing.

17    Q.    Okay.

18    A.    Yeah, that's -- that's the trash thing.

19  That's when I got to the point where I said, look,

20  you're going to have to move me or move her, you

21  know.  It's...

22    Q.    Okay.  And did you -- if you look at

23  the front page of this, on December 9th, LePrincess

24  asks you to provide your statement.  Did you

25  provide LePrincess with a statement?

Kitchens, Cynthia v
Boeing Company

Cynthia Kitchens
February 23, 2017

212

1      A.   Because whenever I said I got 900, and

2  he looked at me, he goes, why, you worked for my

3  department for me?  And I said, I don't know why.

4      Q.   Okay.

5      A.   Now the one for the 600, that's when I

6  thought, okay -- that was this past time.  And I

7  said, okay, I'm turning this in.  And then that's

8  when I turned it in and...

9      Q.   Okay.  So as I understand it, I've

10  handed you this last exhibit that we marked -- what

11  exhibit number is that?

12      MS. HUNT:  42.

13  BY MS. CHERRY:

14      Q.   -- 42, that you filed for the internal

15  ADR process over the raise issue.

16      A.   Yes.

17      Q.   And as I understand it, Boeing's

18  internal ADR department turned it over to Boeing's

19  internal EEO department to investigate, correct?

20      A.   Correct.

21      (DFT. EXH. 43, Boeing, TBC/CK_000443

22  through TBC/CK_000444, was marked for

23  identification.)

24  BY MS. CHERRY:

25      Q.   Now I'm going to hand you what I've

1  marked as Exhibit 43 and ask if you recognize this

2  as Boeing's EEO investigation.

3      A.   Yes.  Because I told them that, you

4  know, they needed to check and -- and see why the

5  paper said 600, I got.  And then that's when he

6  came back and said that they had adjusted -- they

7  adjusted my -- I guess, where you're supposed to be

8  for what your job scope is.  And that was the

9  difference in the $600.  So I said, well, if that's

10  what it was, then I don't have an issue with it.

11  But that was this past year.  That was not the one

12  that Gordon got $2,000 more than me.

13      Q.   But this actually doesn't say that it

14  was adjusted.  It just says that your work history

15  reflects that you actually received an $1,800

16  salary increase.

17      A.   And that's what it says.  But when he

18  talked to me on the phone, he said it was an

19  adjustment that was done.  Because I said, you need

20  to find out why my paper says 600 and your --

21  you've got 18 something.

22      Q.   Yeah.  Do you get pay stubs?

23      A.   It's direct deposit.

24      Q.   Okay.  Do you get documentation of the

25  direct deposit?

220

1    Ron weren't involved with other buildings.

2        A.    No.

3        Q.    Okay.  So after you were under Rocky's

4    supervision for a month or so when you came

5    back --

6        A.    Yes.

7        Q.    -- you then got moved under Ron Pentz?

8        A.    Correct.

9        Q.    Okay.  Do you know how long Rocky

10   Haskell had been working on covering second and

11   third shift?

12       A.    I don't know when Steve Parrinello was

13   moved, like when I was out sick between January and

14   March.  But I knew as soon as he was moved to the

15   other building, which I think was the end of

16   January, I can't -- I don't know for sure, somebody

17   had just told me, so Rocky took over that, when he

18   was moved over to final assembly.

19       Q.    Okay.

20       A.    So I believe it was like the end of

21   January, but I didn't come back until March.

22       Q.    In March.  Okay.

23             So as I understand your testimony, you

24   believe that you, on third shift, were moved from

25   Rocky Haskell to Ron Pentz because Ron Pentz wanted

1    to put you on a PIP?

2        A.    Correct.  And the reason I know that is

3    because -- so -- and this is what made me so

4    nervous, was two -- Bill -- when Bill showed Keith

5    Castleberry what he had and was going to ethics,

6    within two weeks, he was moved in the 19 Building.

7    Like, that week.  And then within two weeks, they

8    gave him Ron, and Ron put him on a PIP and then

9    walked him out.

10            So when they put me under Ron, there

11   was no reason for me to be switched to another

12   manager.  So two weeks -- two weeks to the day

13   after he had me, he's going to put me on a PIP.

14   And then I know what comes next.  You're going to

15   walk -- and I said to him when he was meeting with

16   me that day, I said, you're putting me on a PIP so

17   you can walk me out.  He goes, is that what you

18   believe?  And I said, yes.

19            Because even my leadership coach told

20   me that the reason -- I said, why don't they just

21   say that they want to get rid of you, it's time to

22   go?  Why do they have to humiliate you and put you

23   on a PIP and walk you out when you've been a good

24   employee?  And she said, that's their legal

25   document for you being let go.  They have to have

Kitchens, Cynthia v
Boeing Company

Cynthia Kitchens
February 23, 2017

222

1   that document.  That PIP has to be recorded so that

2   they can show that you didn't do your job and you

3   are gone.

4           So, you know, I have too good of an

5   aviation career to be let go from Boeing after

6   seven years of working hard, to let that happen.

7   And I just got to the point where I was like so

8   stressed out and couldn't deal with it that night.

9   And I just said, this is it, I'm done.  Because at

10  that time, I was physically sick and couldn't even

11  come to work anyway.

12          Q.   Do you know what PIP stands for,

13  Ms. Kitchens?

14          A.   It's a performance improvement plan.

15          Q.   Okay.

16          A.   But I know, just like the PMs, they're

17  used in retaliation.  They are not used for what

18  they really would be used for.  Because Teri

19  Roumillat who got -- I had to put her on a PIP

20  because she was 15 certs behind, I helped her get

21  her certs back and worked with her and made sure

22  that she did not get fired.  I didn't feel with Ron

23  that I had that same opportunity.

24          If Victor -- Rocky would have done that

25  to me, I would have worked it.  Because I know he

228

1          A.   I don't know who she worked with.

2          Q.   Was she working with Stephen (sic)?

3          A.   She had all the buildings, so I don't

4    know who she had.

5          Q.   Did she work with Bill Hobek?

6          A.   I don't know.

7          Q.   Do you know if she worked with any

8    other employee at Boeing who was on a PIP?

9          A.   No, I don't know that.  You're not

10   really supposed to know who is on a PIP.  It's like

11   a secret.

12         Q.   Okay.  So if -- as I understand it, you

13   said Rocky Haskell reported to Neil Wright as well?

14         A.   Yes.

15         (DFT. EXH. 44, E-mail, TBC/CK_000701,

16   was marked for identification.)

17   BY MS. CHERRY:

18         Q.   I'm going to hand you what I have

19   marked as Exhibit 44.  Ms. Kitchens, this is an

20   e-mail from you to Ron Pentz on June 1st.

21         A.   Uh-huh.  Right.

22         Q.   And the subject says:  Approve again.

23   This is referencing some vacation days that you've

24   requested?

25         A.   Right.

1      Q.    And it looks like you were requesting

2  June 16th?

3      A.    Uh-huh.

4      Q.    June 19th and 20th; is that correct?

5      A.    Correct.  Uh-huh.  It already had been

6  approved by Steve, so I just wanted to make sure

7  Ronnie was aware of it.

8      Q.    Okay.  And there was a reference about

9  booking a cruise for your grandson?

10      A.    Yes.

11      Q.    Did you go on that cruise?

12      A.    Yes, I did.

13      Q.    Now let's see.  That e-mail was sent on

14  June 1st at 1:42 a.m.

15           (DFT. EXH. 45, E-mail, TBC/CK_000746,

16  was marked for identification.)

17  BY MS. CHERRY:

18      Q.    I'm going to hand you what I have

19  marked as Exhibit 45.  Here's an e-mail from you to

20  LePrincess Porter that same day, but it was about

21  an hour and a half earlier.

22      A.    Uh-huh.

23      Q.    You're asking LePrincess if she's met

24  with Ron yet?

25      A.    Yeah.  They were supposed to talk about

1    a little bit, Ms. Kitchens.

2        A.    Uh-huh.

3        Q.    And I can appreciate that you don't

4    remember exact dates.

5        A.    Uh-huh.

6        Q.    But you've e-mailed Ron a few times in

7    early June.  We have seen those e-mails, telling

8    him I've got vacation lined up, I'm going to be

9    late, or I'm out sick, or whatnot at the beginning

10    of June.

11        A.    Uh-huh.

12        Q.    And I see no indication or reference

13    anywhere to a PIP or anything like that.

14              Then I see an e-mail from you to Ron

15    saying you're going to be out on a leave of absence

16    starting on June 13th.

17        A.    Uh-huh.

18        Q.    So prior to June 13th, had Mr. Pentz

19    put you on a PIP?

20        A.    No.

21        Q.    Prior to June 13th, had he told you he

22    was going to put you on a PIP?

23        A.    Yes.

24        Q.    Now, as I understand it, you're out.

25    You are not physically at work between June 13th

1    and June 27th, correct?

2         A.    Correct.

3         Q.    Okay.  So Mr. Pentz can't give you a

4    PIP then, correct?

5         A.    Correct.

6         Q.    And you either came back on the 28th or

7    the 29th, correct?

8         A.    Uh-huh.  Correct.  It was a Monday.

9         Q.    Okay.  And as I understand it, you have

10   sent your e-mail to Ellen Martin on June 29th.

11   That's the date of this e-mail, correct?

12        A.    Okay.

13        Q.    So this is after you returned from your

14   leave.

15        A.    Yes.  That was when he told me that he

16   was putting me on the PIP.  That's why I went back

17   to my -- on the 28th, that's why I went back to my

18   desk and wrote this letter to the head.

19        Q.    Okay.  Now I actually thought that you

20   told me, you just testified -- and I can get the

21   court reporter to read it back -- that Mr. Pentz

22   told you that he -- before you left on June 13th

23   that he was going to put you on a PIP.

24        A.    He did.  He told me two or three times

25   that he was going to put me on a PIP.

Kitchens, Cynthia v
Boeing Company

Cynthia Kitchens
February 23, 2017

245

1    Q.    Okay.

2    A.    He told me when we did the review with

3    that development page, that he was going to put me

4    on it.  Senior Manager Kelly was in the office.

5    And he told me when he had me stay over that

6    morning that he was going to put me on the PIP.

7    Q.    Okay.  So you're out for two weeks, and

8    then you return.

9    A.    Correct.

10    Q.    And when you return, he approaches you

11    again about the PIP?

12    A.    Uh-huh.

13    Q.    Okay.  Did Mr. Pentz ever sit down and

14    give you the PIP?

15    A.    No.

16    Q.    Okay.

17    A.    That's why I felt like it was a

18    intimidation.  It was like threatening.  He was

19    threatening me with it, but he wasn't actually

20    doing it.

21    Q.    Then you sent your e-mail to

22    Ms. Martin, correct?

23    A.    Yes.

24    Q.    On the 29th?

25    A.    Uh-huh.

Kitchens, Cynthia v                                    Cynthia Kitchens
Boeing Company                                         February 23, 2017

246

1          Q.    Okay.  And as I understand it, the very

2    next day, you tendered your resignation?

3          A.    Correct.

4               (DFT. EXH. 49, 6/30/2016, Kitchens

5    handwritten note, TBC/CK_00028, was marked for

6    identification.)

7    BY MS. CHERRY:

8          Q.    I'm going to hand you what I've marked

9    as Exhibit 49.  Is that your resignation letter?

10         A.    Uh-huh.  Plus, I sent it in a e -- I

11   sent it in a text form, too, to LePrincess, Ron,

12   and Victor.

13              (DFT. EXH. 50, E-mail, TBC/CK_000447,

14   was marked for identification.)

15   BY MS. CHERRY:

16         Q.    I'm going to hand you Exhibit 50.

17         A.    And I also had a handwritten of what I

18   was turning in at the -- at the welcome center to

19   the security guard, of what things -- items I was

20   giving him, and he signed it for me.

21         Q.    And in the handwritten resignation

22   letter that we marked as Exhibit 49, is that the

23   letter you left at the welcome center?

24         A.    Yes.  With the key to the desk where

25   the computer was.

Kitchens, Cynthia v
Boeing Company

1      A.    Correct.

2      Q.    The first one you have listed is

3  supplier quality in April of 2015.

4      A.    Yes.

5      Q.    Okay.  What --

6      A.    When she asked, I didn't have -- I knew

7  I applied for different jobs.  I didn't have exact

8  dates and all that stuff because it was done

9  through the Boeing computer, through -- for

10 Boeing.com.

11     Q.    Okay.

12     A.    And everything should be recorded on

13 there for dates and times and -- of the ones I

14 applied for.  I applied for a lot of positions.

15     Q.    Okay.  Well, let me ask you about the

16 ones you have identified first.

17     A.    Uh-huh.

18     Q.    So the supplier quality, was that a

19 manager position?

20     A.    Yeah.  Yes, it was a manager's position

21 in the supplier quality.

22     Q.    And was it a K-level manager's

23 position?

24     A.    Yes.

25     Q.    Okay.  Do you know how many people

1   applied for that position?

2        A.   No.  But I know the guy who got it, and

3   he was qualified.

4        Q.   He was qualified?

5        A.   I asked, and he was qualified.

6        Q.   Okay.  And what was his name?

7        A.   Steve -- I don't know the last name

8   now, but when they -- or Greg?  Was it Greg?

9   Sorry.  When they told me, I said, oh, okay, I

10  totally understand why he got it.  I agreed.

11       Q.   Okay.

12       A.   I don't mind losing a job to somebody

13  who has the qualifications.  I just don't like when

14  I know the ones that went out on flight line have

15  less background than me and they got the job.

16       Q.   Well, I'll ask you about flight line.

17  You have got that one, third.

18       A.   Uh-huh.  Right.

19       Q.   But the next one, you have quality

20  manager, K-level.  Do you know how many people

21  applied for that position?

22       A.   No.

23       Q.   Do you know who was hired in that

24  position?

25       A.   No.

1    Q.    So do you have any information about

2    the qualifications of the person who --

3    A.    Are you talking about the flight line

4    one?

5    Q.    I'm talking about the second one you

6    have listed in your charge --

7    A.    Quality manager, K-level, July?

8    Q.    Yes.

9    A.    Okay.

10    Q.    Do you know who was selected for that

11    position?

12    A.    It was somebody over in -- it was for

13    final assembly.  And Steve just said some guy got

14    it over there because he decided to take that

15    instead of the flight line one.

16    Q.    Okay.  Do you know anything -- do you

17    know the name of the individual who got that

18    position?

19    A.    No.

20    Q.    Do you know the qualifications of the

21    person who got that position?

22    A.    No, I don't.

23    Q.    Do you know whether you are more

24    qualified than the person who got the position?

25    A.    No.  Because I didn't know at the time

1  we were allowed to ask those questions, after you

2  applied for a job, that they have to let you know

3  who received it and what their qualifications were

4  above yours.  Not what all their qualifications

5  were, but what you needed that they had.

6        Q.   Okay.

7        A.   So I didn't know until after I filed

8  this that I was -- she told me at the EEOC office

9  that I was able to ask those questions.  Didn't

10 know that before.

11       Q.   Sure.

12            So have you come to know -- do you know

13 the gender of the person who was hired?

14       A.   It was -- it was a male.

15       Q.   Do you know the age of the person who

16 was hired?

17       A.   No, I don't.

18       Q.   Okay.  And I believe you said you don't

19 know the qualifications of the person who was

20 hired?

21       A.   No, I don't.

22       Q.   Okay.  Then the third position you have

23 listed is flight line.  It says:  Flight line and

24 quality assurance.

25            Was that a K-level management position?

1     A.     Yes.

2     Q.     Okay.  And do you know who was selected

3  for that position?

4     A.     Yeah.  Chris Johnson or Jordan.  I

5  can't -- Chris Johnson is what I think his name is,

6  who no longer works there.  He was arrested for tax

7  evasion.  The other guy, I can't think of his name.

8  And the reason I know the qualifications was -- I

9  mean, I'll think of the other one after we're

10  talking -- but I went to an IA seminar with the

11  other gentleman, and I know what his qualifications

12  were with mine.  I had the repair station over him.

13  He didn't have that.  He had an A&P and an

14  inspector's license.

15     Q.     Okay.  You said you went to an IA.

16  What is an IA?

17     A.     It's an inspector's authorization.  You

18  go to the FAA up in Columbia once a year for

19  renewal on it.

20     Q.     Okay.  And help me understand -- so are

21  we talking about Chris Johnson or are we talking

22  about the other person?

23     A.     The other person.  I'll think of his

24  name.

25     Q.     So were there -- were there two K-level

1   management positions on the flight line?

2        A.    Yes.

3        Q.    And were they both open at the same

4   time?

5        A.    Yes.

6        Q.    And you applied for -- you just

7   applied, and --

8        A.    Right, to get --

9        Q.    -- they were filling two spots?

10       A.    Correct.  And they were both filled by

11  males, early 40s.

12       Q.    Okay.  And you know the name Chris

13  Johnson?

14       A.    Right.

15       Q.    And you don't know the name of the

16  other individual?

17       A.    I know the other one, I just have to

18  think of it.  It will -- just give me a minute when

19  we -- hope to come back to that.

20             So I know Chris, he had an A&P.  I

21  don't believe he had an IA.  He -- I ran -- did

22  audit for the 121, which was Charleston airport

23  through Boxell, and I know he didn't have that

24  background.  And I had the FAA accountable

25  manager's position that he did not have.

1   Q.   Okay.  So you believe you were more

2   qualified than he?

3   A.   Yeah.  He even said so, when I said to

4   him -- because he didn't want the job.  It was on

5   third shift at the time.  And I said, why did

6   they -- Chris, why did they pick you over me?  I --

7   you know, I want third.  He said, I don't know why

8   they picked me over you anyway, you're more

9   qualified.  And even the other gentleman said,

10  Cindy, you should be out here with us, you've got

11  the background.  And I'm like, I know.

12          I wish I could think of his name.  Oh,

13  well.

14  Q.   Do you know who the hiring manager for

15  that --

16  A.   This actually went through Neil Wright.

17  Q.   -- for the flight line position?  Okay.

18  A.   Supposedly, my name was one of 12 that

19  they were going through to decide who the two

20  people would be.

21  Q.   So it's your understanding that you

22  made, what I'll call, the short list?

23  A.   Yes.  I was at least in the running.

24  Q.   Okay.  Do you know how many people

25  applied for these two flight line positions?

1    A.    They said they had 12 applications.   So

2    I don't know if that was the total or -- they said

3    that there's 12 applications and you're one of

4    them.

5    Q.    Okay.   When you say "they said," who is

6    "they"?

7    A.    Senior management.   I asked Steve

8    Parrinello.

9    Q.    Okay.   And so Mr. Parrinello told you

10   that you were one of the 12?

11   A.    12, correct.

12   Q.    -- in consideration for the two

13   positions?

14   A.    Correct.

15   Q.    But you don't know how many people

16   overall may have applied for these positions?

17   A.    No, I don't.

18   Q.    Do you know the PM scores of any of the

19   these 12 candidates?

20   A.    No, I don't.

21   Q.    Do you know -- other than what you've

22   just told me, do you have any other information to

23   support your position that you're more qualified

24   than the two people who were hired?

25   A.    No.   Just my certificates.

1     Q.   Okay.  Do you know who made the hiring

2  decision on those other positions?

3     A.   No.  They were all different.

4     Q.   Okay.  Do you have any information to

5  support what I understand your allegation to be,

6  that you did not get hired for any of these

7  positions because of your gender?

8     A.   Yeah.  The flight line one.

9     Q.   Okay.  So it's your contention that you

10  did not get the flight line position because of

11  your gender?

12     A.   Correct.

13     Q.   Okay.  And on what do you base that?

14     A.   Well, whenever I said to Steve, why

15  are -- why did they pick Chris because Chris didn't

16  want to go out there on third shift?  Steve

17  Parrinello I'm talking about.  He said, just be

18  glad you're not going out there because it would be

19  too much for you.  He said, you're in the heat,

20  you're walking around all the time.

21        And I said, you know what?  Let me get

22  that position.  And if I know I'm not capable of

23  doing it, I'll be the first to say I can't do this

24  job.  But you're not giving me the opportunity to

25  do that.  And that's when he said there was 12

284

1   applicants and you're in the -- you were in the

2   pile.  So you know, they picked who they wanted.

3        Q.   Okay.  What does not wanting the

4   position because of the heat and walking around all

5   the time have to do with your gender?

6        A.   I just think -- well, I thought it was

7   age, that that one was age, because he felt that I

8   wasn't physically able to do it.  So that's why

9   I -- I always thought it was my age on that, not

10  female.  The reason I thought it was female was

11  because they took the two younger men for the

12  position and not me.

13       Q.   Okay.  So it's not because of anything

14  anybody said.  It was just you drew that conclusion

15  because two men were hired for the position?

16       A.   The two younger men, yes, were hired.

17       Q.   Okay.  Well, I'm asking about gender.

18       A.   Gender, yes.

19       Q.   Okay.

20       A.   They picked the two males.

21       Q.   And then you interpreted Steve's

22  comment to mean you didn't get the position because

23  of your age?

24       A.   Because of age, uh-huh.

25       Q.   Okay.  How about disability?  What does

Kitchens, Cynthia v
Boeing Company

Cynthia Kitchens
February 23, 2017

285

1   any disability have to do with not --

2        A.    Just -- just what Mike Tidmore said

3   about having the chemo fog or was it my

4   age -- with, you know, not being able to remember.

5        Q.    I'm going to reach across here,

6   Ms. Kitchens.  You're welcome to see.

7              And I'm going to hand you Exhibit 2.

8   And this -- when I have been asking you about the

9   flight line position that you were talking about, I

10  understood you to be talking about the flight line

11  K-level manager, correct?

12       A.    Correct.  This was another one.  This

13  came out afterwards.  The two K-levels were filled

14  first.

15       Q.    Okay.

16       A.    And I said to my executive leadership

17  coach, maybe it's -- you know, maybe I'm -- I'm too

18  qualified for what they're looking for.  So I

19  applied for the L-level position, which is one

20  higher, and didn't get anything for that either.

21       Q.    Okay.  And --

22       A.    And I don't know who was hired for

23  this.

24       Q.    Okay.  And that's what I was going to

25  ask you.  So what we've marked as Exhibit 2 was a

287

```
 1          A.    Yes.

 2          Q.    -- hiring decision?

 3          A.    Yes.

 4          Q.    Okay.  So do you think that a candidate

 5    with a higher PM score would be considered more

 6    qualified than a candidate with a lower PM score?

 7          A.    Definitely.

 8          Q.    Okay.  When you were talking earlier in

 9    your deposition about conversations with Ron

10    Pentz --

11          A.    Uh-huh.

12          Q.    -- and you made a comment about being

13    qualified because you're now the director of

14    quality at your current employer --

15          A.    Uh-huh.

16          Q.    -- what is the name of your current

17    employer?

18          A.    Aviation Instrument Technology.

19          Q.    Okay.

20          A.    Inc.

21          Q.    Would you agree with me that the

22    director of quality at Aviation Instrument

23    Technology, Inc. is not the same as the director of

24    quality at Boeing?

25          A.    At Boeing?  No, they're not the same.
```