Cynthia Kitchens v. The Boeing Company
Case No. 2:16-cv-03723-RMG-MGB
DEFENDANT THE BOEING COMPANY'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM

# EXHIBIT "H"

## EXCERPTS FROM THE DEPOSITION OF RON PENTZ

```
 1            IN THE UNITED STATES DISTRICT COURT
                 DISTRICT OF SOUTH CAROLINA
 2                    CHARLESTON DIVISION

 3   CYNTHIA KITCHENS,

 4         Plaintiff,

 5         vs.              CASE NO. 2:16-cv-03723-RMG-MGB

 6   THE BOEING COMPANY,

 7         Defendant.

 8

 9   DEPOSITION OF:        RONALD J. PENTZ

10   DATE:                 August 4, 2017

11   TIME:                 8:58 AM

12   LOCATION:             Nexsen Pruet
                           205 King Street, Suite 400
13                         Charleston, SC

14   TAKEN BY:             Counsel for the Plaintiff

15   REPORTED BY:          MARIE H. BRUEGGER, Registered
                           Professional Reporter, CRR
16

17

18

19

20

21         A. WILLIAM ROBERTS, JR., & ASSOCIATES

22            Fast, Accurate & Friendly

23   Charleston, SC     Hilton Head, SC    Myrtle Beach, SC
     (843)722-8414      (843)785-3263      (843)839-3376
24
     Columbia, SC       Greenville, SC     Charlotte, NC
25   (803)731-5224      (864)234-7030      (704)573-3919
```

Kitchens, Cynthia v.　　　　　　　　　　　　　　　　　　　Ronald J. Pentz
Boeing Company　　　　　　　　　　　　　　　　　　　　August 04, 2017

```
                                                            17
 1         A.   I have.  We do this every year.
 2         Q.   And is that covered in your May
 3   training?
 4         A.   This is separate from that.
 5         Q.   And when did you receive the training
 6   this year?  Do you remember?
 7         A.   It was at the very beginning of the
 8   year, January.
 9         Q.   What position did Ms. Kitchens hold?
10         A.   She was, when she was working with me,
11   a first-line quality manager.
12         Q.   And what does a first-line quality
13   manager do?
14         A.   A first-line quality manager is a
15   manager that leads a team of inspectors out on the
16   shop floor and responsible for the inspection of
17   the assembly and build-up of the airplane.
18         Q.   And how long did you supervise
19   Ms. Kitchens?
20         A.   It was, if I remember correctly, about
21   two months, maybe.
22         Q.   And are you aware of why she was
23   transferred to your area from Rocky Haskell?
24         A.   Yes.
25         Q.   Why?
```

Kitchens, Cynthia v.  
Boeing Company

Ronald J. Pentz  
August 04, 2017

18

1  A.  She was transferred to my area because
2  Rocky was on second shift. He was responsible for
3  a very large territory, which would be
4  aft/mid/composite fab, so he ran all the second
5  shift. I had gotten another manager, another
6  senior manager, on first shift. I was by myself.
7  And typically, the third shift managers would
8  report to the first shift managers. So upon
9  receiving an additional senior manager on first
10 shift, we reverted back to the first shift senior,
11 which would have been me, Cells 30 and 40,
12 supervising third shift.
13     Q.  And who was the other senior manager
14 that you got on first shift?
15     A.  Kelly Henderson.
16     Q.  And during those two months that you
17 supervised Ms. Kitchens, did she have any
18 complaints to you about the work environment?
19     A.  I don't remember any specific
20 complaints. I know she wasn't happy about the
21 position on the flight line, not receiving that,
22 and she said she was going to go find out who had
23 the -- who received the position, but not a
24 complaint, just a statement.
25     Q.  And what is a flight line position?

20

```
 1        Q.   And what were your concerns?
 2        A.   Concerns with Ms. Kitchens around
 3   performance?
 4        Q.   Yes.
 5        A.   Generally, several years of low
 6   performance scores.
 7        Q.   So your PIP was based on her previous
 8   evaluations?
 9        A.   The general themes in those were, and
10   I've also witnessed them, were communication
11   problems.  Trying to remember several other.
12   Understanding the scope of work in the building,
13   conflict amongst peers, written and oral
14   communication.  Those are a few that I can
15   remember.
16        Q.   And what, specifically, was the
17   communication problem?
18        A.   Communication wasn't always clear.
19        Q.   Anything else?
20        A.   Besides not being clear, not always at
21   the right levels.  I do remember sometimes
22   Ms. Kitchens would elevate issues that she should
23   be able to handle on her own or with her peers.
24        Q.   And what issues specifically are you
25   talking about that she elevated and should have
```

1 been able to handle with her peers?
2       A.    I think just some of the -- I don't
3 remember specifics, but I think -- and I'd have to
4 look, but just day-to-day stuff that any typical
5 quality manager would run into, call board issues,
6 employee corrective action, minor issues.
7       Q.    And what is a call board issue?
8       A.    I'm sorry.  A call board issue is how
9 the quality managers and the inspectors can pull
10 up on a computer to see what type of inspections
11 are being requested, where the inspections are at,
12 who's logged on, who's working those inspections,
13 what the backload is, call times.  They can use it
14 to understand if they need to move their
15 inspectors around to different areas.  At the end
16 of the shift, you backlog what you need to turn
17 over to the following shifts.  It's one of their
18 primary responsibilities.
19      Q.    And did she have problems with
20 particular employees regarding corrective action
21 issues?
22      A.    The last one I can remember was with
23 two employees.
24      Q.    Who were they?
25      A.    I believe one was Autry Comer, and I

22

1   can't remember the name of the second person.
2        Q.   And did they make complaints about
3   Ms. Kitchens's performance as a manager?
4        A.   Not to me.  I believe they might have
5   had some discussions with HR, but I can't
6   remember.
7        Q.   What was your specific issue with
8   Ms. Kitchens's understanding the scope of work?
9        A.   So being on third shift, she was
10  responsible for an entire factory.  She was
11  responsible for structures, wiring, delivery.  She
12  didn't know the technical details of all the
13  wiring and the entire flow of the build.
14       Q.   And when you say the entire flow of
15  the build, what do you mean?
16       A.   Like what specifically happens in each
17  work area -- Cell 10, Cell 20, Cell 30, Cell 40 --
18  and the technical understanding of how to resolve
19  any issues that may arise.
20       Q.   And other than -- you stated earlier
21  the employee corrective action amongst her peers,
22  but you also stated conflict amongst her peers.
23  Was that the same issue with her employees?
24       A.   She had conflict amongst her peers,
25  and I believe I was referring to employee

Kitchens, Cynthia v.  
Boeing Company

Ronald J. Pentz  
August 04, 2017

23

1  corrective action on her team, administering that.
2      Q.   And what other peers was she having
3  conflict with?
4      A.   There's been multiple: Brent Reinig,
5  Tracy Darnell, Dennis Iler. Those are a few that
6  I can remember her having conflict with.
7      Q.   And did you keep track of these?
8      A.   I would say I could find details on it
9  if I needed to.
10     Q.   Did you document them in her employee
11  file?
12     A.   I think those are saved in emails. I
13  mean, I only had her for like two months, so we
14  were starting to work through issues.
15     Q.   At any point in time during your
16  employment with Boeing, have you kept a journal?
17     A.   What I keep is notes, not specifically
18  a journal.
19     Q.   And what is included in those notes?
20     A.   In those notes I'll usually include
21  any sort of performance issues, and I'll usually
22  save emails if there's performance issues.
23     Q.   And what were your issues with her
24  written and oral communications?
25     A.   Very confusing. The written

                                                                    24
1    communications, when I'd receive them, I could not
2    follow them, the grammar, sentence composure, just
3    not written well enough to understand.
4         Q.   Were you aware that she was seeing a
5    leadership coach to help her with those?
6         A.   Yes, ma'am.
7         Q.   And had they improved any through that
8    counseling with the leadership coach?
9         A.   I can't say if they did because the
10   first time I heard about that was several weeks
11   before she left during one of our conversations.
12        Q.   And in that two months that you
13   supervised her, how many times could you say that
14   you met with her?
15        A.   I would estimate three times, four
16   formal meetings.
17        Q.   And did you discuss each of those
18   areas that you had concerns regarding in those
19   meetings?
20        A.   Absolutely.  Our last meeting was
21   specifically about that.
22        Q.   And in that last meeting, did you
23   actually have the performance improvement plan
24   prepared to give to her?
25        A.   I did not.

Kitchens, Cynthia v.  
Boeing Company

Ronald J. Pentz  
August 04, 2017

25

```
 1         Q.   When were you planning on finalizing
 2   that performance improvement plan?
 3         A.   It would have been in the following
 4   one or two weeks after that discussion.
 5         Q.   And while you were preparing to give
 6   her that one to two weeks, were you giving her the
 7   opportunity to improve those areas?
 8         A.   I would say there's always an
 9   opportunity to improve those areas, so yes.
10         Q.   What is the purpose of a performance
11   improvement plan?
12         A.   The performance improvement plan is
13   just as it sounds.  It is a document that the
14   manager would use to detail performance areas that
15   need to be improved.  I would review it with the
16   employee, ensure understanding of the employee,
17   come to an agreement on the accuracy and the
18   expectations, and then we would both sign the
19   performance improvement plan and execute it.
20         Q.   During your time as a manager in
21   issuing performance improvement plans, have you
22   ever had an employee improve and not be terminated
23   based on a PIP?
24              MS. CHERRY:  Object to the form.  You
25   can answer if you can.
```

Kitchens, Cynthia v.  
Boeing Company

Ronald J. Pentz  
August 04, 2017

26

```
 1           THE WITNESS:  Can you say that
 2   question one more time, please?
 3   BY MS. HUNT:
 4        Q.   During your time as a manager in
 5   issuing performance improvement plans, have you
 6   ever had an employee improve to the point that
 7   they were not terminated?
 8           MS. CHERRY:  Same objection.
 9           THE WITNESS:  The answer to that
10   question would be all of the previous, which would
11   have been two, were released from the company.  I
12   would note that she was not on a performance
13   improvement plan, and I had not reviewed it with
14   her yet.
15   BY MS. HUNT:
16        Q.   Based on that answer is you're telling
17   me you issued two PIPs before this, and they were
18   released?
19        A.   Over the years, yes, over three years.
20        Q.   Who did you discuss the performance
21   improvement plan for Ms. Kitchens with before
22   discussing it with her?
23           MS. CHERRY:  Object to the form.
24           THE WITNESS:  So I would have had a
25   discussion with HR about it, I would have had a
```

Kitchens, Cynthia v.  
Boeing Company

Ronald J. Pentz  
August 04, 2017

27

1  discussion with Keith Castleberry, and likely
2  maybe one or two executives or M levels. I really
3  can't remember who else.
4  BY MS. HUNT:
5       Q.   Who did you discuss it with in HR?
6       A.   The HRG would be LePrincess Porter.
7            (Plaintiff's Exhibit 5, Salaried Job
8  Classifications, was marked for identification.)
9  BY MS. HUNT:
10      Q.   I'm going to hand you what's been
11 marked as Exhibit No. 5 and ask you --
12           MS. HUNT:  I think I already handed
13 you that one, right?
14           MS. CHERRY:  I've got it.
15 BY MS. HUNT:
16      Q.   Do you recognize that document?
17      A.   I do.  It's a salaried job
18 classification of a quality manager K level.
19      Q.   And was that the position that
20 Ms. Kitchens held?
21      A.   That is the title of the position that
22 Ms. Kitchens held.
23      Q.   And I'll give you a minute to look at
24 it.  Would you say those are her duties, her major
25 tasks and additional tasks that were assigned to

Kitchens, Cynthia v.  
Boeing Company

Ronald J. Pentz  
August 04, 2017

32

1   A.   I don't believe I had.  I did review
2   like all of the previous years' performance
3   evaluations, but I don't think I have ever given
4   her a formal performance evaluation.
5        Q.   Do you remember particularly what
6   years you reviewed her evaluations?
7        A.   It would have been in likely the last
8   three years.
9        Q.   Was there anything in any of those
10  evaluations that stood out to you?
11       A.   Yeah.  There was negative comments
12  left by the previous senior managers.  I don't
13  remember the specifics of it, but that was, you
14  know, something I was taking into account during
15  the drafting of the PIP.
16            (Plaintiff's Exhibit 8, Manager
17  Close-Out Evaluation [TBC/CK_1042-1047], was
18  marked for identification.)
19  BY MS. HUNT:
20       Q.   I'm going to hand you what's been
21  marked as Exhibit No. 8.  This was provided by
22  Boeing to us, and it's I believe the 2015, given
23  in 2016.  Do you recognize that document?
24       A.   Yes.
25       Q.   And did you review this in preparation

```
 1         Q.   There you go.  Do you recognize that
 2   email?
 3         A.   I do.  I received this on my
 4   BlackBerry rather unexpectedly.
 5         Q.   And why do you say unexpectedly?
 6         A.   I didn't expect it.
 7         Q.   Do you think that she could have
 8   improved on the PIP?
 9         A.   I do.
10         Q.   And sitting here today, why do you
11   believe she could have improved?
12         A.   Well, generally speaking, when we were
13   having our initial conversations, she was fairly
14   positive about working to improve performance.
15   That's not always the case.
16         Q.   And what specifically did she say that
17   led you to believe that?
18         A.   Demeanor, just, you know, speaking
19   with -- she was speaking with her leadership
20   coach.  She was working with a leadership coach.
21   It's kind of an indication that she's trying.  She
22   was willing to share the issues where she was
23   having performance problems with me, open about
24   it.  So I was really optimistic that if we
25   documented everything she was working on and
```

Kitchens, Cynthia v.  
Boeing Company

Ronald J. Pentz  
August 04, 2017

41

```
 1   worked through it together, it would definitely
 2   have been resolved.
 3         Q.   And what performance issues was she
 4   open about with you?
 5         A.   Again, it was a while ago during that
 6   conversation, I'd have to look in details, but it
 7   was the things that she was working on with her
 8   leadership coach, communication, general
 9   leadership things that all Boeing managers are
10   evaluated against.
11         Q.   Do you think you would have kept notes
12   regarding that?
13         A.   That conversation?
14         Q.   Yes.
15         A.   Yes.
16         Q.   In the normal course if you met with
17   an employee, did you keep notes regarding the
18   conversation?
19         A.   Generally, conversation around
20   performance, I would keep notes.
21         Q.   And was this one of those formal
22   meetings that you talked about?
23         A.   This would have been --
24         Q.   Not the resignation letter, but the
25   conversation regarding her performance issues that
```

48

```
 1              Q.   From her medical leave.
 2              A.   Were there -- state that question one
 3   more time.
 4              Q.   When she returned from her medical
 5   leave, were there any issues with any of her
 6   employees?
 7              MS. CHERRY:  Object to the form.
 8              THE WITNESS:  I don't remember when
 9   her medical leave was, but -- and if this previous
10   corrective action memo was before or after her
11   leave dates.
12   BY MS. HUNT:
13              Q.   I have nothing further.  Answer any
14   questions that Molly may have.
15                        EXAMINATION
16   BY MS. CHERRY:
17              Q.   Mr. Pentz, I've just got one.  You
18   referenced notes that you took in your meeting, or
19   meetings, with Ms. Kitchens.  Have you produced
20   those notes in the course of this litigation?
21              A.   Yes, ma'am.
22              MR. RAWL:  Can I ask you one thing?
23              MS. CHERRY: Yeah.  Let's take one
24   quick break.
25              (A recess transpired.)
```